UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

ANDRE NORWOOD,

                            Petitioner,

            -vs-

DALE ARTIS,

                       Respondent.

_____

**DECISION AND ORDER**
**No. 04-CV-6023(VEB)**

## I.      INTRODUCTION

Andre Norwood ("Norwood" or "petitioner") challenges his conviction on July 27, 2000, in New York State Supreme Court (Monroe County) on one count of second degree (depraved indifference) murder by means of a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. *See* Docket No. 1. The parties have consented to disposition of this matter by the undersigned pursuant to 28 U.S.C. § 636(c). *See* Docket No. 10.

## II.     FACTUAL BACKGROUND AND PROCEDURAL HISTORY

The conviction here at issue stems from the shooting on December 31, 2000, of Delores Person ("Person" or "the victim"), a friend of Norwood who was living with him at the home of Melvin Smith ("Smith") and Mattie Kimble ("Kimble") in the City of Rochester. By Monroe County Indictment No. 44/2000, Norwod was charged with one count of second degree (depraved indifference) murder (N.Y. Penal Law § 125.25(2)).[1] Norwood was tried before a jury

---

[1]       Section 125.25(2) provides that a "[a] person is guilty of murder in the second degree when: [u]nder circumstances evincing a depraved in difference to human life, he recklessly engages in conduct which creates a grave risk of death to another person, and thereby causes the death of another person[.]" N.Y. Penal Law § 125.25(2).

before Justice Fisher in Monroe County Supreme Court in February 2000.

At trial, Smith testified that in the July 1999, he was living with his girlfriend, Kimble, and her children at his house on 136 Fulton Avenue in the City of Rochester. T.224-25.[2] The victim had moved in with Smith and Kimble in November of 1999. T.227. When Smith moved to Rochester from Milwaukee, Wisconsin, thirteen years ago, he had come with Kimble, her children, and Norwood, whom he had known since 1993. T.226. From 1993 up until January 1, 2000, Smith and petitioner had been friends. In fact, Norwood had been living with Person at Smith and Kimble's residence at the time of the shooting. T.227. According to Smith, he "just thought they [Norwood and Person] were friend [sic]"; the two of them slept in the same room but on separate cots. T.230.

On December 31, 1999, Norwood asked Smith to take him to a New Year's Eve party 210 Weaver Street, and Smith eventually agreed to do so. T.231-32. There was another passenger in the car, Chevoyia Stanley ("Chevoyia"), who lived across the street at 137 Fulton Avenue and was married to a woman named Ladonna Stanley ("Ladonna"). T.233-34. Smith left the party at "[a]bout 9:30, 9:35" by himself; Norwood and Chevoyia were still at the party. T.236. Smith eventually returned to the party "a little after ten" at this time with Person. T.237. He observed "some commotion" between "Norwood and another dude and Delores [Person][.]" T.238. Smith did not know who the third person was and did not "have any idea what the commotion was about[.]" T.239. It became clear to Smith that Norwood was no longer a welcome guest because he heard Chevoyia's mother and cousin  "hollering, 'he got to go.'" T.239. Smith then decided to leave and take Norwood with him. *Id.* Person left with them, too. T.240.

---

[2]        Citations to "T.__" refer to the trial transcript.

Smith recalled that on the way home, Norwood "just kept on saying he [sic] going back over there because he think [sic] they [sic] playing with him." T.240-41. Smith did not respond to this at all. T.241. They got home a little after 11 p.m.; Person got out of the car, followed by Norwood, and they both went into the house. *Id.* Smith did not immediately go inside but turned around and was talking to Ladonna briefly. T.242, 243.

As Smith was going into the house, Norwood "was coming out of the door with the [shot]gun[,]" and he "was trying to put it [the gun] together." T.243-44. Smith stated that the murder weapon introduced at trial looked like the shotgun Norwood was holding but he could not say if it was the same gun. T.245. Smith had seen the gun before when a man running from the police had thrown it into the bushes near their house and Norwood had retrieved it. T.246. On the night of the incident, Smith "tried to grab [the gun] away from him" but Norwood "had took [sic] the other part and like he was going to hit [Smith] in the head with it." T.247. Norwood said to Smith, "[G]et back." *Id.* Smith was afraid that Norwood was going to hit him. *Id.* Norwood "just kept wanting to go back to this party." *Id.* Smith refused to bring him back. Norwood stepped outside; Smith locked the door behind him and told him, "cool down." T.248. The gun was still in two pieces. *Id.*

At this point, Smith testified, he, Kimble, and the children were inside the house, along with Person, who was sitting at the kitchen table next to the window listening to music. T.249, 250, 251. Smith and Kimble were in the front room. *Id.* About "twelve, fifteen minutes at the most" later, Smith walked into the kitchen to fix drink; it was closer to midnight. Smith looked over at the window and saw that the "shade was coming down" and then "[w]hen he saw the top of the gun come through there it just fell [sic] the whole shade." T.252. Norwood was holding the

gun; Smith could see from petitioner's chest upwards, and Norwood was not wearing or mask or anything covering his face. T.253. Smith said, "Dre, what are you doing, what the f___ you doing. And he just kept on continuing what he was doing," which was pointing the gun at Smith, at first. T.254. Smith was "scared" so he ran to a small pantry off the kitchen. T.254-55. Before he ran, Person, the victim, "just hop[ped] up [from the table] and said, "[S]top playing, Dre." T.256.

As Smith was standing in the pantry, he heard the gun go "boom." T.255. After the bang, he "just saw her [the victim] sitting there for a minute and took [she] two small steps back and fell" in the middle of the room. T.257. Smith could see outside the pantry door and "could see Delores [Person] holding her side and she was saying, damn, Dre." T.256. Person was "[n]o more than six inches" away from the gun while she was doing this. *Id.* Smith waited for a minute because he was scared and did not know where Norwood was; he looked at Person and "she was just laying there squirming." T.258. Person "was trying to talk and [he] just tell [sic] her don't try." *Id.* It "looked like she was trying to reach for [him] [but] [he] couldn't do nothing [sic]." *Id.*

Smith did not see Norwood or the gun anywhere. T.259. Smith testified that Kimble called the police. *Id.*

Kimble, who was sitting in the front room while this was occurring, testified that she heard a very loud boom and right afterward heard Person saying, "[D]amn, Dre." T.313. Kimble could see Person "like falling back" as Kimble was on the phone calling the police. T.313-14.

Ladonna Stanley, the neighbor who lived across the street from Kimble and Smith, testified that on New Year's Eve, she heard a gun shot but did not pay it any attention because "[m]ost of the time on New Year's to bring in the new year people go out and shoot up in the air"

-4-

in her neighborhood. T.353. Ladonna did not go see what was going on immediately; she just said, "[W]ell, they are cutting up already." *Id.* She then answered a knock at her door and found Norwood standing with a shotgun. T.354. Norwood came into the house and started to look at the door, looking like "he was in a hurry."  T.355. Unbeknownst to Ladonna, Norwood previously had left some shotgun shells at her house on the TV stand, and that night, he started loading the shotgun with them. T.356-58. Ladonna asked Norwood what he had done. Norwood said, "I just shot up Mattie[3] [sic] in their motherfucking house."

Norwood kept loading his shotgun with shells. One fell and Ladonna kicked it under the couch; Norwood flipped the couch over to get it. T.359. Ladonna testified that she was scared. T.360. There came a time when Ladonna started running for the door, and Norwood pushed her outside and locked the door behind her. *Id.* As Ladonna ran across the street to Kimble and Smith's house, she saw police coming up the street and told them Norwood was at her house. T.361, 362, 363.

Chevoyia Stanley testified that on New Year's Eve of 1999, he went over to his mother's house at 210 Weaver Street (the location of the party attended by Norwood) and then, at about 7:30 p.m., went over to Smith and Kimble's house. T.409. When he walked in the door, he "heard two gunshots" from the back of the house; he saw Norwood come into the house carrying a shotgun that looked like the murder weapon. T.409-10, 412.  Norwood then broke the gun down into two pieces. T.410-11. Chevoyia asked Norwood if he was ready to go to the party. T.412. Before they left, Chevoyia saw that Norwood had two or three shotgun shells in his

---

[3]        For the sake of clarity, the Court notes that the victim actually was Delores Person, not Mattie Kimble.

pocket, and Chevoyia "told him that he can't go to the party with shotgun shells in his pocket."
T.414. Norwood removed them and after they went over to Chevoyia's house, Norwood put them
behind the TV. T.414-18.

Officer Nicholls testified that when he arrived on the scene at a about 1 a.m., he found the
victim lying on the floor, suffering from a gunshot wound to the chest. T.441.  Upon learning that
the suspect (described in the police broadcast as 6'2", 200 pounds, highly intoxicated and still
armed with a shotgun, T.461) was inside of 137 Fulton Avenue, across the street from the crime
scene, about fifteen to twenty members of the police department's emergency task force also
responded. T.455. Officer Morabito testified that "numerous attempts" were made with a
bullhorn to communicate with the suspect over the course of two hours, but there was no
response. T.467-68. Officer Morabito stated that as a result, they deployed two rounds of pepper
spray in gas form. T.469-71. Some yelling was heard from the house at that point; Norwood
emerged from the house at about 3:30 a.m. and was arrested. T.472-73; 457-58; 474. Officer
Penkitis and Officer Morabito, both task force members, identified Norwood in court T.457-58,
474. According to Officer Morabito, Norwood was able to follow commands to raise his hands
and turn around, and he walked downstairs backwards. T.476-77. Norwood did not fall down and
was not staggering. *Id*.; *see also* T.487-88; T.501-02.  He did not appear to have trouble
maintaining his balance. T.477. As he backed up, Norwood was directed to the ground and went
down to his knees (but did not fall), and was taken into custody. *Id.*; T.489. Officer Patterson,
who searched the house after Norwood was arrested, discovered a pump shotgun leaning near a
window. T.489. He testified that one of the couches inside of 137 Fulton Avenue had been turned
over. T.490; *see also* T.505.

The medical examiner testified that, to a reasonable degree of medical certainty, the victim "died as a result of a single gunshot wound to the abdomen" that caused her to bleed to death. T.543. The ballistics expert performed testing with the shotgun seized during Norwood's arrest and offered as the murder weapon by the prosecution. *See* T.548-55. To a reasonable degree of technical certainty, when one fires number six shot from a weapon such as the shotgun used to commit the crime, the normal flight pattern of the projectile would be downward, due to gravity. T.552. At about five and six feet, one sees a "single hole in the target" with that type of shot and that type of weapon. T.553. Given a hypothetical circumstance of one round of shot being fired from the weapon in question at a person's abdominal area and created an almost "round or symmetrical defect" (as found on the victim in this case), the ballistics expert testified that to a reasonable degree of technical certainty, the shooter would have been approximately six feet away from the person who was shot. T.555.  He admitted, however, that he did not do any tests to determine under what set of circumstances that might occur, and said that it was fair to say that six feet was "an outside estimate." T.556. It is possible that it "could have been closer." *Id.* On cross-examination, the ballistics expert admitted that he could not give a minimum distance unless he knew what type of clothing the victim was wearing, looked at the wound, or did actual testing on the weapon. T.557.

The defense called Officer Mooney, who wrote a report about the transport of Norwood following his arrest, indicated in the port that Norwood "appeared intoxicated[.]" T.573. On cross-examination, Officer Mooney testified that the evidence of intoxication was that he noticed a "smell of an alcoholic nature on [Petitioner's] breath." T.573. Officer Mooney said that was "pretty much it" and that Norwood was not stumbling and had no difficulty maintaining his

balance. T.573, 575.

At that point, Petitioner stated on the record that he had decided not to testify, that it was his decision not to testify after speaking with his trial counsel, with whose representation he was satisfied. T.577.

During the proof, the prosecutor requested that the trial court charge murder in the second degree under a theory of depraved indifference to human life, as well as instruct the jury that voluntary intoxication is not a defense to reckless conduct. T.519-21. These applications were opposed by defense counsel, *see id.*; *see also* T.559-60. The trial court granted the prosecutor's request to charge to depraved indifference murder, T.560-61, and stated that it was going to charge the lesser included offense of manslaughter in the second degree, T.564-67. Defense counsel agreed and also asked for the lesser included offense of criminally negligent homicide, which request was denied by the trial court. T.568.

Defense counsel requested a circumstantial evidence charge and reserved argument as to whether he was asking for the "moral certainty" aspect of that charge. T.522-23. The trial court questioned whether there was a circumstantial evidence charge short of the "moral certainty" jury instruction.[4] T.523. The prosecutor opposed any charge regarding "moral certainty." *Id.* Later during the trial, defense counsel argued that the prosecution's case was based solely on circumstantial evidence; the prosecutor responded that there was direct evidence of petitioner's guilt–namely, the victim's excited utterance made at the time of the shooting and petitioner's

---

[4] In New York, "the oft-quoted rule in criminal cases which depend entirely upon circumstantial evidence [is] that '"the facts from which the inference of the defendant's guilt is drawn must be established with certainty they must be inconsistent with his innocence and must exclude to a moral certainty every other reasonable hypothesis[.]"'" *People v. Barnes*, 50 N.Y.2d 375, 379-80 (N.Y. 1980) (quoting *People v. Cleague*, 22 N.Y.2d 363, 365-366 (N.Y. 1698) (quoting *People v. Bearden*, 290 N.Y. 478, 480 (N.Y. 1946)).

admission of guilt to Ladonna Stanley "about his shooting up Mattie's house." T.568-69. The trial court indicated that it was not going to issue the "moral certainty" circumstantial evidence charge because, in its opinion, each and every element of the prosecution's case against Norwood was not proved solely by circumstantial evidence, and therefore New York law did not require such a charge. T.569-70 (citing *People v. Barnes*, 50 N.Y.2d at 379-80). Defense counsel did not object further. The trial court, however, did not explain the difference between direct evidence and circumstantial evidence during his charge. Defense counsel did not raise any objection during or after the trial court's charge. *See* T.620-47.

The jury was instructed on second degree (depraved indifference) murder and the lesser included offense of second degree manslaughter. It returned a verdict convicting Norwood of count of second degree (depraved indifference) murder, as charged in the indictment. On July 27, 2000, Norwood was sentenced to an indeterminate term of twenty-five years to life imprisonment.

Represented by new counsel on direct appeal, Norwood argued that the prosecutor made three remarks during his opening statement which constituted prosecutorial misconduct and that the trial court erred in failing to instruct the jury with the "moral certainty" jury instruction on circumstantial evidence. The prosecution argued lack of preservation as to two of the three instances of misconduct because trial counsel failed to object. With respect to the issue concerning the "moral certainty" charge, the prosecution asserted that a moral certainty-circumstantial evidence charge was unwarranted because there was direct evidence of petitioner's guilt and that, in any event, petitioner had waived any claim of error as to the trial court's failure to give an "explanation" about the difference between direct and circumstantial evidence. The

Appellate Division, Fourth Department, of New York State Supreme Court unanimously

affirmed petitioner's conviction on November 15, 2002. *People v. Norwood*, 299 A.D.2d 810

(App. Div. 4th Dept. 2002).  The Appellate Division did not address the preservation and waiver

issues and instead disposed of both claims on the merits:

> There is no merit to the contention of defendant that he was deprived of a fair trial
> by remarks made by the prosecutor in his opening statement. Further, the evidence
> against defendant was not wholly circumstantial, and thus [the trial court] did not
> err in denying defendant's request for a circumstantial evidence charge[.]

*People v. Norwood*, 299 A.D.2d at 810 (citations omitted). Leave to appeal to the New York

Court of Appeals was denied on January 7, 2003. *People v. Norwood*, 99 N.Y.2d 584 (N.Y.

2003).

Norwood filed his petition for a federal writ of habeas corpus pursuant to 28 U.S.C. §

2254 on December 24, 2003. *See* Docket No. 1. Respondent answered the petition on March 16,

2004. *See* Docket Nos. 5, 6. Respondent asserts that both of petitioner's claims are without merit

and do not warrant habeas relief. Respondent does not raise the defense of non-exhaustion, and it

appears that all of petitioner's claims are fully exhausted and properly before this Court on

habeas review. *See* 28 U.S.C. § 2254(b)(1)(A) ("An application for a writ of habeas corpus . . .

shall not be granted unless it appears that – (A) the application has exhausted the remedies in the

courts of the State[.]").

Because the filing of this petition postdates the enactment of the Anti-terrorism and

Effective Death Penalty Act of 1996 ("AEDPA"), AEDPA's revisions of 28 U.S.C. § 2254

govern this proceeding.  *See Williams v. Taylor*, 529 U.S. 362, 402 (2000). When Congress

enacted Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), it "significantly

curtailed the power of federal courts to grant the habeas petitions of state prisoners." *Lainfiesta v. Artuz*, 253 F.3d 151, 155 (2d Cir. 2001) (citing *Williams*, 529 U.S. at 399). A Federal court may not grant a habeas petition on a claim that was adjudicated on the merits in State court unless that adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1), (2).

In *Sellan v. Kuhlmann*, 261 F.3d 303 (2d Cir. 2001), the Second Circuit "began to identify a test" for whether a state court has adjudicated a state prisoner's federal claim on the merits for AEDPA purpose–that is, "'when it (1) disposes of the claim on merits, and (2) reduces its disposition to judgment.'" *Jimenez v. Walker* 458 F.3d 130, 140 (2d Cir. 2006) (quoting *Sellan v. Kuhlmann*, 261 F.3d at 312 (quotation and alteration marks omitted in original)). In *Jimenez*, the Second Circuit answered the second question–how to determine whether a disposition is "on the merits"–by directing habeas courts to look at the face of state-court opinion, whether the state court was aware of a procedural bar, and the practice of state courts have done in similar cases. *Id.* at 145 & n. 16 (citing, *inter alia*, *Sellan*, 261 F.3d at 313). Here, the state court unquestionably reduced its disposition to judgment. However, it presumably was aware of procedural grounds for dismissal because the People, in opposition to petitioner's direct appeal, asserted the defenses of lack of contemporaneous objections to the prosecutorial misconduct claims and waiver of the trial court's alleged error in the jury instructions. *See* People's Appellate Brief, Respondent's Appendix of Exhibits E at 89-115, attached to Respondent's Answer to the Petition. On the other hand, the appellate court explicitly stated that the prosecutorial misconduct claim had no merit and that the trial court did not error in failing to

give the circumstantial evidence charge; it did not refer to either of the claims being unpreserved.

Today, the Court need not become ensnared in the decidedly thorny issue of whether there was

an adjudication on the merits under these circumstances: Even considering the petition under a

less deferential, pre-AEDPA standard of review, *see Messiah v. Duncan*, 435 F.3d 186, 197 (2d

Cir. 2006), neither of petitioner's claims come close to entitling him to the habeas relief he seeks.

For the reasons set forth below, the application for a writ of habeas corpus is denied and the

petition is dismissed.

## II.    DISCUSSION

### A.    Prosecutorial Misconduct

The Second Circuit and the Supreme Court have "note[d] the narrow standard governing

federal habeas corpus review of a petition brought by a state prisoner," which appropriately is

"'the narrow one of due process, and not the broad exercise of supervisory power.'" *Darden v.*

*Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 642

(1974)); *accord*, *e.g.*, *Floyd v. Meachum*, 907 F.2d 347, 353 (2d Cir. 1990). The Supreme Court

accordingly has instructed federal habeas courts reviewing claims of prosecutorial misconduct

brought by state petitioners to distinguish between "ordinary trial error of a prosecutor and that

sort of egregious misconduct . . . amount [ing] to a denial of constitutional due process."

*Donnelly*, 416 U.S. at 647-48  (citations omitted); *accord Floyd*, 907 F.2d at 353. *Donnelly*'s

standard requires the federal habeas court to ask whether "'the prosecutorial remarks were so

prejudicial that they rendered the trial in question fundamentally unfair.'" *Floyd*, 907 F.2d at 353

(quoting *Garofolo v. Coomb*, 804 F.2d 201, 206 (2d Cir. 1986) (citing *Donnelly*, 416 U.S. at 645

and, *inter alia*, *United States v. Modica*, 663 F.2d 1173 (2d Cir .1981), *cert. denied*, 456 U.S. 989

-12-

(1982)); *see also Garofolo*, 804 F.2d at 206 (noting that harmless error doctrine may be applicable to prosecutorial misconduct involving statements to the jury) (citing *United States v. Hasting*, 461 U.S. 499, 510-12 (1983)). Given the narrow scope of habeas review of prosecutorial misconduct claims, a habeas petitioner must show "that he suffered actual prejudice because the prosecutor's comments during summation had a substantial and injurious effect or influence in determining the jury's verdict." *Tankleff v. Senkowski*, 135 F.3d 235, 252 (2d Cir. 1998) (quoting *Bentley v. Scully*, 41 F.3d 818, 823 (2d Cir. 1994) (internal quotation marks and citation omitted in original)).  In making the determination of whether a defendant has suffered "actual prejudice" as a result of the prosecutorial misconduct, the Second Circuit has examined "'the severity of the misconduct; the measures adopted to cure the misconduct; and the certainty of conviction absent the improper statements.'" *Tankleff*, 135 F.2d at 252 (quoting *Floyd*, 907 F.2d at 355 (quoting *United States v. Modica*, 663 F.2d at 1181) (internal quotation marks omitted); citing *United States v. Parker*, 903 F.2d 91, 98 (2d Cir. 1990)).

The three instances of alleged misconduct occurred during the prosecutor's opening statement.  Petitioner claims that the prosecutor 1) suggested that certain evidence was going to be withheld from the jury; 2) unfairly shifted the burden of proof; and 3) improperly vouched for the credibility of his witness.

In the first remark about which Norwood complains, the prosecutor told the jury that he expected the proof to show that the victim and petitioner were at a New Year's Eve party when a former male acquaintance spoke with the victim, but then improperly suggested by his remark that certain evidence was going to be withheld from the jury. T.170-71. The prosecutor said,

You are also going to hear testimony that after Mr. Smith arrives with Miss

Person [the victim], Miss Person begins talking with the brother of Chevoyia Stanley, a man named Christopher Stanley. He is going to testify and you are going to learn unbeknownst to the defendant Mr. Stanley was a person how [sic] had known Delores Person previously. They had grown up in the same neighborhood and attended the same schools. So, they were making small talk at this party. I anticipate the proof is going to point for reasons you will never learn the defendant becomes upset about this and it becomes apparent to some of the people at the party that the defendant is upset.

. . .

And, again, the proof will show that the Defendant was upset about what was taking place at the party and, again, you may never learn the details."

T.170-71.

According to petitioner, this remark was improper because it implied that certain evidence was being kept from the jury and left the jury to speculate about what was being withheld from them concerning events at the party. After looking at the remark in context, the Court disagrees with petitioner's characterization of the prosecutor's comment. The Court is doubtful as to whether this remark, in fact, was erroneous. Even if it were erroneous, defense counsel did not object at the time.  The Second Circuit repeatedly has held that "'where, as here, the defendant did not object to the remarks at trial, reversal is warranted only where the remarks amounted to a "'flagrant abuse.'"" *United States v. Coriaty*, 300 F.3d 244, 255 (2d Cir. 2002) (quoting *United States v. Germosen*, 139 F.3d 120, 128 (2d Cir. 1998) (quoting *United States v. Araujo*, 79 F.3d 7, 9 (2d Cir. 1996)), *cert. denied*, 525 U.S. 1083 (1999)). The isolated two comments about which petitioner complains cannot be characterized as "flagrant abuse" and  "do not come within hailing distance of prejudice[,] *Coriaty*, 300 F.3d at 255.

Petitioner's second contention is the prosecutor improperly shifted the burden of proof in commenting that the defendant did not claim that the shooting was an accident when he confessed to Ladonna Stanley, immediately after the shooting, that he "just shot up Mattie in

their f____ing house." Defense counsel objected to this claim on the basis that the prosecutor

was "burden shifting[.]" T.177. The trial court overruled the objection.  The prosecutor did not

pursue that line of argument. Defense counsel did not request a more specific curative instruction

on the burden of proof.

Even if the remark could be interpreted as suggesting that the defendant had any burden

to disprove the elements of depraved indifference murder, a proposition with which the Court

does not agree, under the circumstances of this case, any prejudice was mitigated by the trial

judge's final instructions to the jury that the burden of proof always rests with the prosecution

and does not shift to the defendant. *E.g.*, T.624-25. Given that the alleged misconduct here was

isolated to the opening statement, and that the rest of the trial, including the prosecutor's

summation, was fair and temperate, the severity of the prosecutor's alleged misconduct was

"mitigated by the brevity and fleeting nature of the improper comments." *Tankleff*, 135 F.3d at

253. "[L]ooking at all the circumstances" in this case, the standard instructions on the burden of

proof given by the trial court were "sufficient to cure any harm that the prosecutor's

misstatements may have caused."  *Id.*

Finally, Norwood contends that the prosecutor improper vouched for the credibility of his

witnesses:

> The proof is going to show that when Mr. Smith basically speaks to the police he
> didn't tell them everything he saw or heard. Mr. Smith, he won't lie, and the proof
> will show he did that in an effort to protect his friend of five years. The proof will
> show, ladies and gentlemen, that eventually he told the truth. He told them what
> he saw and he come [sic] in this courtroom and indeed tell you the truth of what
> took place that morning.

T.179.  The first two sentences above, taken in context, are actually the prosecutor

acknowledging that one of his witnesses initially was not entirely truthful with the police about what he had observed; the prosecutor did elicit testimony from Smith that he purposefully did not tell the police everything because he "didn't want to be involved." T.260. Smith explained that at the time both the victim and the petitioner were his friends. *Id.* Thus, the first part of the above-quoted statement was not improper, and the prosecutor's prediction as to the testimony was borne out.

The last part of the comments, however, could be interpreted as the prosecutor vouching for the credibility of his witness. The law on this point is well-settled: It is improper for a prosecutor to interject personal beliefs into a summation. *United States v. Young*, 470 U.S. 1, 8 (1985) (quoting ABA Standards for Criminal Justice 3-5.8(b) (2d ed. 1980) (quotation marks omitted)); *accord, e.g., United States v. Nersesian*, 824 F.2d 1294, 1328 (2d Cir. 1987). However, a reviewing court "must evaluate the challenged remarks in the context of the trial as a whole, for the government is allowed to respond to argument that impugns its integrity or the integrity of its case." *United States v. Rivera*, 22 F.3d 430, 438 (2d Cir. 1994). When the defense has "attacked the prosecutor's credibility or the credibility of the government agents, the prosecutor is entitled to reply with rebutting language suitable to the occasion." *Id.* (quotations omitted). Here, the so-called "invited response" rule is not applicable since the alleged vouching occurred during the prosecutor's opening statement before defense counsel had addressed the jury. The remark, however, went unnoticed by defense counsel, who may have made the strategic decision not to call attention to it with an objection. In any event, where there is no defense objection, reversal based on a prosecutorial comment is not warranted unless the misconduct may be characterized as "flagrant." *Coriaty*, 300 F.3d at 255. The Court cannot say that this comment

approached what could be described as flagrant. *See, e.g.*, *United States v. Rivera*, 22 F.3d at 437.

In sum, looking at the alleged prosecutorial in the context of the trial as a whole and applying the three *Modica* factors, the Court finds that Norwood's right to a fair trial was not prejudiced. The Court has reviewed the trial transcript in its entirety and it is apparent that these three instances of alleged prosecutorial misconduct were, if anything, minor aberrations in an otherwise fair proceeding, during which the prosecutor conducted himself in a manner befitting his public office. The Court notes that the prosecutor's summation was not marred by improprieties and there were no objections by defense counsel. The Court further observes that the trial court went out of its way to compliment both defense counsel and the prosecutor on the their presentations of their respective cases and stated that he had enjoyed trying the case with them.

Looking at the second *Modica* factor, the measures taken to cure the alleged misconduct, the Court observes that defense counsel did not object to the first and third comments and therefore did not give the trial court the opportunity to issue curative instructions. As noted above, in the absence of a contemporaneous objection by defense counsel, "the statement will not be deemed a ground for reversal unless it amounts to a flagrant abuse." *United States v. Rivera*, 22 F.3d at 437  (citation and internal quotation marks omitted). Certainly, even assuming *arguendo* that this was misconduct, these two isolated instances cannot be described as a "flagrant abuse" warranting reversal of the conviction. *See Coriaty*, 300 F.3da t 255.

Finally, as to the third *Modica* factor, a review of the evidence presented at trial shows that proof of petitioner's guilt was overwhelming. It is important to note that the key prosecution witnesses–Smith, Kimble, and Chevoyia and Ladonna Stanley–all were *friends* of the defendant.

-17-

The Court is convinced that even absent the alleged misconduct, in light of the compelling and the overwhelming evidence of petitioner's guilt, he still would have been convicted. *See*, *e.g.*, *United States v. Modica*, 663 F.2d at 1181 (holding that "if proof of guilt is strong, then the prejudicial effect of the [prosecutor's] comments tends to be deemed insubstantial" ); *accord*, *e.g.*, *Strouse v. Leonardo*, 928 F.2d 548, 557 (2d Cir. 1991) ("Moreover, we believe that absent the alleged misconduct, given the overwhelming evidence of Strouse's guilt, he still would have been convicted.). Accordingly, finds that petitioner was not denied due process because of any alleged prosecutorial misconduct. Habeas relief will not issue his claim of prosecutorial misconduct.

**B.    Trial Court's Failure to Issue Circumstantial Evidence ("Moral Certainty") Jury Instruction**

It is well-established that a federal habeas court "is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire*, 502 U.S. 62, 67-68  (1991) ("We have stated many times that 'federal habeas corpus relief does not lie for errors of state law.'") (quoting *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990)). Before a federal court may overturn a conviction resulting from a state trial in which an erroneous instruction was used, or a properly requested instruction was not given, "it must be established not merely that the instruction is undesirable, erroneous, or even 'universally condemned,' but that it violated some right which was guaranteed to the defendant by the Fourteenth Amendment." *Cupp v Naughten*, 414 U.S. 141, 146 (1975); *accord*, *e.g.*, *Davis v. Strack*, 270 F.3d 111, 123 (2d Cir. 2001). Clearly, a habeas petitioner has a difficult showing to make in order to succeed on a claim that a jury instruction was erroneously refused.

-18-

With regard to the propriety, as a matter of state law, of petitioner's request for an

Under New York law, a circumstantial evidence jury charge is only required, at the defendant's

request, when the evidence against a defendant is comprised *solely of* circumstantial evidence.

*E.g.*, *People v. Daddona*, 81 N.Y.2d 990, 992 (N.Y. 1993) ("Whenever a case relies wholly on

circumstantial evidence to establish all elements of the charge, the jury should be instructed, in

substance, that the evidence must establish guilt to a moral certainty."); *People v. Barnes*, 50

N.Y.2d at 380. However, when the case is also supported by direct evidence, it does *not* qualify

for the circumstantial evidence instruction, and the trial court need not give the so-called "moral

certainty" circumstantial evidence standard. *People v. Daddona*, 81 N.Y.2d at 992 (citations

omitted); *accord People v. Roldan*, 88 N.Y.2d 826, 827 (N.Y. 1996) (holding that case against

defendant involved direct evidence–namely eyewitness testimony which, if believed by the jury,

established that defendant engaged in acts which directly proved that at the very least he acted as

a lookout while the crime was being committed, along with conduct before and after the actual

commission of the crime; defendant's accessorial guilt could not be viewed as premised solely on

circumstantial evidence, and, thus, did not qualify for the circumstantial evidence instruction).

Here, the trial court properly denied defense counsel's request for the "moral certainty"

circumstantial evidence jury instruction because the case against Norwood was also supported by

credible direct evidence by Smith, who saw victim being shot and heard the victim immediately

say, "[D]amn, Dre," thereby identifying petitioner as the shooter. Kimble, who was sitting in the

front room while this was occurring, heard a very loud boom and right afterward heard the victim

say, "[D]amn, Dre." On this basis alone, the trial court properly denied petitioner's request for a

circumstantial evidence charge as a matter of state law because in New York, excited utterances

following the shooting in which a victim names the defendant as the person who shot him have been held to constitute direct evidence of the defendant's guilt. *E.g.*, *People v. Pagan*, 177 A.D.2d 604, 605 (App. Div. 2d Dept. 1991) ("Furthermore, the defendant was not entitled to a circumstantial evidence charge. Although the People's case relied upon some circumstantial evidence, the victim's excited utterances following the shooting in which he named the defendant as the person who shot him constitute direct evidence of the defendant's guilt. Clearly, had the victim survived and testified in court, his testimony that the defendant shot him would have constituted direct evidence[,] *see*, RICHARDSON, EVIDENCE § 3 [Prince 10th ed]. The victim's statements were no less direct evidence merely because they were made out of court yet properly admitted into evidence pursuant to an exception to the hearsay rule[,] *see*, 2 WHARTON'S CRIMINAL EVIDENCE § 301 [14th ed]). Accordingly, as the prosecution's case rested upon both direct and circumstantial evidence, the court was not obligated to provide the requested "moral certainty" circumstantial evidence charge[.]") (some internal citations and other citations omitted), *lv. denied*, 79 N.Y.2d 862 (N.Y. 1992); *accord People v. Vigliotti*, 270 A.D.2d 904, 905 (App. Div. 4th Dept.) ("The court also properly denied defendant's request for a circumstantial evidence charge. The excited utterances of a victim identifying the shooter constitute direct evidence of guilt[.]") (citation omitted), *lv. denied*, 95 N.Y.2d 839 (N.Y. 2000). The Court notes that the law draws no distinction between circumstantial evidence and direct evidence in terms of weight or importance, and either type of evidence may be enough to establish guilt beyond a reasonable doubt.

Furthermore, there was testimony by Ladonna Stanley that, soon after the shooting, Norwood came over to her house, was acting like he was in a hurry and was reloading his

shotgun. When she asked him what he had done, he said he had "just shot up Mattie in their motherfucking house." Although this statement incorrectly identified the actual victim, it is nonetheless a relevant admission of guilt and constitutes direct evidence.[5] *People v. Rumble*, 45 N.Y.2d 879, 880-81 (N.Y. 1978); *People v. Rutledge*, 286 A.D.2d 962, 962 (App. Div. 4th Dept. 2001); *People v. Major*, 251 A.D.2d 999, 1000 (App. Div. 4th Dept. 1998); *People v. Emery*, 159 A.D.2d 992, 992 (App. Div. ) ("Defendant's statement to [witness] that 'I did it, I did it, I did it' while indicating a stabbing gesture and raising his right fist to his chest could have reasonably been interpreted by the fact finder as a 'relevant admission of guilt'".). Thus, as a matter of New York law, it was entirely proper and correct for the trial court to refuse to give a jury instruction on circumstantial evidence. Norwood's case was supported both by direct evidence and circumstantial evidence and therefore did not qualify for a circumstantial evidence jury charge.

In any event, even if it were possible that a circumstantial evidence charge was warranted, the trial court's failure to issue a properly requested jury charge does not, standing alone, violate petitioner's right to due process. *E.g.*, *Blazic v. Henderson*, 900 F.2d 534, 540 (2d Cir. 1990). Rather, "[f]or an erroneous state jury charge [or the failure to give an appropriate requested one] to result in a federal constitutional deprivation, 'the ailing instruction by itself [must have] so infected the entire trial that the resulting conviction violates due process.'" *Id.* (quoting *Cupp v. Naughten*, 414 U.S. at 147 (alteration in original)). In *Blazic*, the Second Circuit concluded that petitioner was entitled under New York law to a justification charge on the facts of his case, but

---

[5]     Technically, this admission constitutes both direct and circumstantial evidence–direct evidence that petitioner shot someone at the scene of the homicide and circumstantial evidence that the person shot was Ms. Person.  Nevertheless, New York law supports a finding that this constitutes direct evidence for the purpose of determining whether a circumstantial evidence instruction should be given.

because it "perceive[d] no basis to conclude that a jury would have responded differently had the charge been given[,]" it rejected petitioner's contention that the trial court's omission of a justification charge "'so infected the entire trial that the resulting conviction violate[d] due process,'" *Blazic*, 900 F.2d at 543 (quoting *Cupp*, 414 U.S. at 147). Here, as in *Blazic*, the Court does not discern any basis for finding that the jury would have acquitted petitioner had it heard the circumstantial evidence charge. Therefore, the omission of the charge did not "so infect[ ] the trial that the resulting conviction violate[s] due process,'" *Blazic*, 900 F.2d at 543 (quoting *Cupp*, 414 U.S. at 147). Even assuming that a circumstantial evidence charge should have been given, which this Court explicitly holds was *not* the case, any error was harmless in light of the overwhelming evidence against Norwood. *See Davis v. Strack*, 270 F.3d 111 (2d Cir. 2001).

In *Davis v. Strack*, the Second Circuit granted habeas relief where there denial of a justification charge "completely deprived" petitioner of a "compelling defense for the jury to consider–on which the People had bore the burden of proof" to the homicide charge and "guaranteed his conviction." 270 F.3d at 131. Here, petitioner offered a handful of defenses–that Smith was a coward and was not credible; that Smith's verison of events that the bullet traveled upward was contradicted by the ballistics testimony that the bullet's trajectory was downward; and that Ladonna was not credible based on her lifestyle, *e.g.*, she permitted drugs to be sold out of her house. Based only on the testimony of Officer Mooney, who said that after his arrest Norwood had a smell of alcohol on his breath, defense counsel also argued that Norwood was intoxicated. Counsel further suggested that there was another gunman for whom the police did not conduct an adequate investigation. Given the facts as presented at trial, none of these defenses could be described as "compelling," as was the case in *Davis v. Strack*, 270 F.3d 111.

Unlike the situation described by the Second Circuit in *Davis*, in Norwood's case there is no reasonable probability, let alone a "substantial likelihood that a properly instructed jury would have found in [Petitioner's] favor on the homicide charge[,]" *Davis v. Strack*, 270 F.3d at 111.

There has been no error of state law, and no federal due process violation. The jury instructions given at Norwood's trial were in all respects proper, and his trial complied with the requirements of due process such that the result was fair. Habeas relief will not issue on this claim.

## IV.    CONCLUSION

For the reasons stated above, Andre Norwood's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 is denied, and the petition is dismissed.  Because Norwood has failed to make a substantial showing of a denial of a constitutional right, I decline to issue a certificate of appealability. *See* 28 U.S.C. § 2253.

**IT IS SO ORDERED**

/s/ *Victor E. Bianchini*

_____
VICTOR E. BIANCHINI
United States Magistrate Judge

DATED:        April 26, 2007
                     Rochester, New York.

-23-